STATE *ex rel.* CORLEY *et al. v.* HINES *et al.*

(In Banc.   Jan. 12, 1948.)

[33 So. (2d) 317.   No. 36575.]

**Greek L. Rice,** Attorney General, by **John E. Stone** and **W. B. Fontaine,** Assistant Attorneys General, for appellant.

61

**Green & Green** and **Reynolds S. Cheney**, all of Jackson, for appellee, Grady Hines.

Wells, Wells, Newman & Thomas, of Jackson, and **L. A. Smith, Jr.**, of Holly Springs, for appellee, Richard Stanton.

66

See also Clark v. State, 169 Miss. 369, 152 So. 820.

Argued orally by **John E. Stone**, for appellants, and by **Reynolds Chaney** and **Calvin Wells, III**, for appellees.

**Griffith, J.**, delivered the opinion of the court.

Appellees, complainants in the trial court, are engaged in the profession of combating the ravages of termites in wooden buildings, or in the wooden portions of buildings. Termites live in subterranean colonies sometimes as much as 25 to 30 feet underground, and their food is obtained from the glucose found in wood, in search of which the insects in large numbers attack the wood in buildings. The only practical method of control is to insulate them from the wooden portions of a structure so that they cannot reach any such portions. They can penetrate a crack in a brick or concrete foundation if of so much as one-thirty-second of an inch, and such cracks when made by viabrations or settling of the supporting ground are soon discovered by them, and any piece of wood leaned against the building will furnish them a passage to it.

The approved method of insulation is to use a poisonous chemical solution with which all the approaches to the woodwork are so thoroughly impregnated that the insects

cannot pass it from the ground; and also that the insects already in the building cannot pass back to the ground which to survive they must do in order to obtain moisture.

Appellees are licensees of the E. L. Bruce Company among the pioneers in this work, which owns and controls a patented process called Terminix. The licensees of this company operate in thirty-five states, all under the same method of treatment and all licensees make contracts with the owners which are in the following form: "The undersigned Terminix Licensee hereby contracts to insulate the building (or buildings) listed below against the attack of subterranean termites, by applying Terminix in accordance with the requirements of the treating technique developed by E. L. Bruce Co. for the sum of ———Dollars. The undersigned warrants that any additional application of Terminix to insulate against the attack of subterranean termites, found necessary upon reinspection, shall be preformed at no* additional cost. This warranty is effective for one year from the date of the original insulation."

The E. L. Bruce Company guarantees the fulfillment of the contract, and the guaranty is insured by an accredited insurance company.

The Plant Board demands that the Terminix contracts be modified so as to read as follows: "In accordance with the regulations and requirements of the Mississippi State Plant Board Rule 69 (as amended May 10, 1946) the Terminix Company contracts to eradicate termites from the foundations and superstructure of the aforesaid buildings."

It will be noted that such a stipulation has no provision whether the eradication must be accomplished in and by the first or original treatment, or whether it will allow subsequent treatments or how many or through what length of time. If we say however, that such a contract means that the contractor shall have a reasonable length of time from the original treatment to make further inspections and to apply additional treatments, it makes no

provisions for the consequences of changes that take place through no fault of the contractor, such as the settling and cracking of the foundations, for the cases where the subsequent acts or neglects of the owner himself have allowed opportunities for reinfestation or for the continuance of such reinfestation, or for other contingencies within like reason, but binds the contractor to absolute eradication, although the testimony when taken from all its sides demonstrates, as we think and as the chancellor by his decree must have found, that it is not within reason in the administration and supervision of this professional service to demand or expect one hundred percent eradication throughout in every such undertaking, even when there are no visible exceptional conditions.

The Plant Board says in its brief that the purpose of the proposed contract is that contracting owners may be assured that termites will be ''definitely removed from their premises; that with the insertion of the word 'eradicate' into the contracts of termite operators in place of the word 'insulate' there can be no room for misunderstanding as to the service which these operators are to perform''; and the Board gives a definition of what it means by the contract word ''eradicate''—''to pluck up by the roots, to root up or out, to extirpate, to abolish, destroy, annihilate''. And the Board says that the further purpose of the proposed contract requirement was· to make it proof sufficient when, on any subsequent inspection, termites were still in the building, that the operator had failed adequately to perform his contract. And yet, as we have already said, the proof is overwhelming, if not undisputed, that it is a practical impossibility in all cases to eradicate termites on the first treatment, and that sometimes it requires repeated treatments to do so.

The Plant Board seeks in the respect last mentioned to avoid the apparent arbitrariness in the proposed contract, first, by allowing the contractor to insert therein a stipulation against ''peculiar or unusual conditions in any building which make eradication doubtful'', if fully de-

scribed in the contract, and, second by the testimony on the part of the Board that in the administration of the requirement imposed upon termite operators, the Board allows a variance or tolerance from the absolute terms of the proposed contract of twenty-five percent,—that is to say, that if and when it is found by the Board on its inspections that a contractor in seventy-five percent of his jobs has attained a complete eradication, he will be deemed fit to continue in his licensed work.

The proof is undisputed that it is not always possible to ascertain the conditions before the work is actually entered upon, and before the contract is made whether unusual or peculiar conditions will be encountered, and certainly conditions which subsequently arise, and which have heretofore been mentioned, cannot be fully described in the contract, and, in the second place, by allowance or tolerance of twenty-five percent in its inspections, the Board confesses that to require more would not be reasonable as a general proposition of over-all administration, but yet proposes to specifically require in its application to specific cases that one hundred percent results shall be attained—that the contractor shall place in the hands of the owner a contract by which, when the owner goes to a court of law, the agreement would mean one thing but that when the conduct of the contractor in respect to it is reviewed by the Plant Board it will mean something else—one hundred percent to the owner, and seventy five percent to the Plant Board.

If the Plant Board in its inspections and administration should require one hundred percent in successful performance under the practices of this profession on pain of the cancellation of the operator's license, none could defend it as being within reason, whence it follows that neither can its action in demanding a hundred-percent contract be sustained as reasonable. An honest, skillful and diligent effort may, and ought to, be required in such matters, of course, but an absolute undertaking in any

professional service such as this would seem to be beyond the bounds of reason.

It will be observed that Section 1, Chap. 171, Laws 1938, provides that the "plant board shall have the power to make rules and regulations to govern the qualifications. and the practicing of persons engaged in the professional services herein defined and to prevent fraudulent practices in the said professional services", including professional services in "entomological work . . . for the control or eradication of any insect pest or rodent". Whether this section is sufficient in its contents to comply with the rule that the legislature cannot delegate its authority and therefore must lay down the standards and prescribe the principles according to and within which the administrative agency or board must proceed as to details, is not debated in the briefs, is not necessary to a decision in the present case, and is here mentioned that it may not be understood inferentially that we have held the provisions sufficient in the respect mentioned. We do not address ourselves to that question at all, so far as decision is concerned.

Affirmed.